# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 13, 2008          Decided July 15, 2008

No. 07-5121

LARRY W. BRYANT,
APPELLANT

v.

ROBERT M. GATES, SECRETARY OF DEFENSE, UNITED STATES
DEPARTMENT OF DEFENSE, ET AL.,
APPELLEES

———

Consolidated with 07-5180

———

Appeals from the United States District Court
for the District of Columbia
(No. 05cv00064)

*Jonathan L. Katz* argued the cause and filed the briefs for appellant.

*R. Craig Lawrence*, Assistant U.S. Attorney, argued the cause for appellees. With him on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *Jane M. Lyons*, Assistant U.S. Attorney.

Before: GINSBURG, BROWN, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GINSBURG.

Concurring opinion filed by *Circuit Judge* KAVANAUGH.

GINSBURG, *Circuit Judge*: Larry Bryant claims the refusal of the Department of Defense to allow his advertisements to be published in its Civilian Enterprise Newspapers violated his rights under the First Amendment to the Constitution of the United States. The district court entered summary judgment for the Government on all Bryant's claims. We affirm the judgment.

## I. Background

Bryant is a would-be contributor to the Civilian Enterprise Newspapers (CENs), which are "published by commercial publishers under contract" with the Department of Defense Components or their subordinate commands (hereinafter DoD) and distributed on military installations. The DoD's sole purpose in authorizing the CENs is "to facilitate accomplishment of the command or installation mission." Department of Defense Instruction (DODI) 5120.4 §§ 6.2.1.1.8, E2.1.2.1 (1997), *available at* http://www.dtic.mil/whs/directives/corres/pdf/512004p.pdf.[*] Like an ordinary newspaper in many respects, a CEN

> contain[s] most, if not all, of the following elements to communicate with the intended DoD readership: command, Military Department, and DoD news and features; commanders' comments; letters to the editor; editorials; commentaries; features; sports; entertainment

---

[*] A "command" is a "unit or units, an organization, or an area under the command of one individual," DODI 5120.4 § E2.1.9.1, and an "installation" is a "DoD facility or ship that serves as the base for one or more commands," *id*. § E2.1.9.3.

items; morale, welfare, and recreation news and announcements; ... and installation and local community news and announcements.

*Id*. § E2.1.2. This content may come from within the DoD or from the publisher with the DoD's approval. *Id*. § E2.1.2.1. The publisher may also sell and publish advertising in a CEN, again subject to the approval of the DoD. *Id*. §§ 4.11, 4.16, 6.2.1.1.5, E2.1.1, E2.1.2.1, E4.1.7.1-4.

A former civilian editor in the Office of the Chief of Army Public Affairs, Bryant has, over the last twenty or so years, submitted to dozens of CENs numerous letters and advertisements, few of which have been published. *See, e.g.*, *Bryant v. Sec'y of the Army*, 862 F. Supp. 574, 576-77 (D.D.C. 1994). This suit arises out of Bryant's having submitted seven self-styled "whistleblower solicitation advertisements" to two dozen CENs. The general import of most of those advertisements can be gleaned from their titles:

- Blow the Whistle on Iraqnam's Battle-of-Baghdad Cover-up!

- Blow the Whistle on ALL Atrocities at Abu Ghraib!

- Join the Revolt Against the 'Feres Doctrine'![*]

- Blow the Whistle on the Military's Psychiatric Retaliation Against Whistleblowers!

---

[*] The "Feres Doctrine" refers to *Feres v. United States*, in which the Supreme Court "conclude[d] that the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." 340 U.S. 135, 146 (1950).

- Resist the Government's Drafty Spin!

- Blow the Whistle on Bush's 'Gulf of Persia' Resolution!

- Blow the Whistle on the Army-CIA McCarthy Saga!<sup>*</sup>

All the military public affairs officers responsible for the various CENs to which Bryant submitted these advertisements declined to publish them, invoking § 4.11 of DODI 5120.4, which provides:

> DoD publications [including CENs] shall not contain campaign news, partisan discussions, cartoons, editorials, or commentaries dealing with political campaigns, candidates, issues, or which advocate lobbying elected officials on specific issues. DoD CE publications shall not carry paid political advertisements for a candidate, party, which advocate a particular position on a political issue, or which advocate lobbying elected officials on a specific issue. This includes those advertisements advocating a position on any proposed DoD policy or policy under review.

Bryant claims § 4.11 "is unconstitutional on its face and as applied to [his] paid Advertisements, by violating his rights to free expression and to freedom of the press" under the First Amendment.

---

<sup>*</sup> The "Army-CIA McCarthy Saga" evidently involves a captain named John J. McCarthy Jr. who, Bryant says, "found himself involuntarily transferred to clandestine duty with a CIA-run operation" toward the end of the Vietnam War to become "an expendable pawn in rogue activity that, to this day, eludes even congressional oversight."

The Government moved to dismiss or for summary judgment, and Bryant cross-moved for summary judgment. The district court granted the Government's motion for summary judgment and denied Bryant's cross-motion.

## II. Analysis

On appeal, Bryant contends § 4.11 of DODI 5120.4 violates the First Amendment because it is vague and is not narrowly tailored to meet a compelling governmental interest. "[R]eview[ing] the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to [Bryant,] and drawing all reasonable inferences accordingly," we affirm the judgment because "no reasonable jury could find in [Bryant's] favor." *Salazar v. Wash. Metro. Area Transit Auth.*, 401 F.3d 504, 507 (D.C. Cir. 2005).[*]

### A. Vagueness

Bryant claims § 4.11 is impermissibly vague on its face and as applied to his advertisements because it does not "clearly prohibit[] 'political' advertising." A regulation of speech must be clear enough to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited," *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972), and to avoid "foster[ing] arbitrary and discriminatory application," *Buckley v. Valeo*, 424 U.S. 1, 41 n.48 (1976) (quotation marks omitted). Our concern about vagueness is elevated when the law regulates speech because it may "operate to inhibit protected expression by inducing citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Id.* (quotation

---

[*] Bryant raises similar constitutional challenges to other sections of DODI 5120.4, but they are sufficiently lacking in merit as not to warrant consideration in a published opinion.

marks and alterations omitted). On the other hand, because § 4.11 does not threaten Bryant (or anyone else) with a sanction for prohibited speech, and therefore does not seem likely to deter anyone from engaging in any protected speech, it is not clear whether the vagueness doctrine applies here at all. *Cf. Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 621 (1998) ("The terms of the provision are undeniably opaque, and if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns. It is unlikely, however, that speakers will be compelled to steer too far clear of any 'forbidden area' in the context of [Federal arts] grants."). We need not decide that question, however, because § 4.11 is not unconstitutionally vague.

Bryant objects specifically to the use of the term "political" in § 4.11. He explains: "The very essence of the CENs is governmental, and thus political, [and] the military itself, as a major government institution, is political." Therefore, Bryant suggests, when the DoD invokes § 4.11 to exclude advertisements such as his, it must be applying a standard that is unstated or undefined and may discriminate upon the basis of the view expressed. We agree with the Government, however, that far from being vague, the bar in § 4.11 is "well-defined." Even if we assume Bryant is correct in claiming that everything CENs publish is "political" in the sense that its publication serves the DoD's purpose of mission support, the context in which that term appears in § 4.11 makes clear that it relates specifically to elections and policy matters of concern to public officials: § 4.11 refers to "campaigns," "candidates," "parties," "lobbying [of] elected officials," "political issues," and "DoD policy." DODI 5120.4 § 4.11; *see Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 412 (1950) (in assessing whether term is vague, the "particular context is all important").

Further to his argument, Bryant suggests the DoD has not applied the regulation in a consistent manner.  In this vein, he points to three instances in which he claims CENs published "politically-related" material notwithstanding § 4.11, specifically: (1) an advertisement inviting service members to an event at which former Senator Dole would be signing copies of his memoir, *One Soldier's Story*; (2) an advertisement recruiting service members to work as FBI agents; and (3) an article entitled "Facing the Future: Terror War Promotes Transformation Concepts."  It is easy to see, however, that Bryant's proposed advertisements are within the scope of the prohibition in § 4.11 whereas the Dole and FBI advertisements and the "Facing the Future" article are not; of these four, only Bryant's advertisements are "political" as that term is used in § 4.11.  Bryant's advertisements addressed controversial, high-level matters of concern to the President, the Department of Defense, or the Congress, such as the operation of the Abu Ghraib prison in Iraq, military conscription, and impeachment of the President for allegedly lying about why the United States invaded Iraq. In contrast, there is no reason to believe Senator Dole's book signing was a political event; his memoir, published nearly a decade after he had left public office, focused upon his service during World War II and his recovery from the injuries he suffered in the war.  The FBI advertisement solicited people working in one area of Government to work in another, related area; and the article entitled "Facing the Future" reported on how "challenges in the field of combat give [the DoD] the opportunity to test new concepts, new organizational concepts, new training concepts and new logistical concepts that help drive transformation to the future."

In sum, the ban in § 4.11 on "political" advertisements is not unconstitutionally vague on its face or as applied to Bryant's ads.  *See McConnell v. FEC*, 540 U.S. 93, 241

(2003) (phrase "political matter of national importance" not unconstitutionally vague).[*]

B.  The Justification for and Tailoring of § 4.11

Bryant next claims § 4.11, "as written and applied" to his advertisements, is not narrowly tailored to serve a compelling governmental interest.[**]  As a general principle, "the extent to which the Government can control access [to a forum it owns or controls] depends on the nature of the relevant forum." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985).  More specifically:

> Restrictions on speech in a *public* forum must be necessary to achieve a compelling state interest and narrowly tailored to that end.  Restrictions on speech in a *nonpublic* forum, on the other hand, are subject to a much less stringent test: they must only be reasonable [in light of the purpose of the forum] and not an effort to

---

[*] Bryant also claims § 4.11 is unconstitutional on its face and as applied because it is "subject to be[ing] applied with unbridled discretion," but this argument is the same as his argument that the regulation is vague (no doubt in part because the two doctrines overlap), and so it fails for the same reason his vagueness argument fails:  Considered in full, § 4.11 adequately constrains the DoD's power.  *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969).

[**] Bryant separately claims § 4.11 is unconstitutionally overbroad.  *See United States v. Williams*, 128 S. Ct. 1830, 1838 (2008) ("statute is facially invalid if it prohibits a substantial amount of protected speech ..., not only in an absolute sense, but also relative to the statute's plainly legitimate sweep").  We do not address that claim separately because it is analytically identical to Bryant's claim that § 4.11 is on its face not narrowly tailored.  *See Bd. of Trs. v. Fox*, 492 U.S. 469, 482-84 (1989).

suppress expression merely because public officials oppose the speaker's view.

*Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1016 (D.C. Cir. 1988) (quotation marks and citation omitted); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677-79 (1998).

A forum is public if it "historically has been devoted to the free exchange of views; streets and parks are quintessential examples." *Stewart*, 863 F.2d at 1016; *see also Ark. Educ. Television Comm'n*, 523 U.S. at 677. Even if a forum was not traditionally open, the government may designate it a public forum by making it "generally available" "for expressive use by the general public or by a particular class of speakers"; for example, "a state university created a public forum for registered student groups by implementing a policy that expressly made its meeting facilities 'generally open' to such groups." *Id.* at 678-79 (quotation marks omitted); *see also Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392 (1993) (government creates public forum when it designates forum "for indiscriminate public use for communicative purposes"). If, however, the government permits only "selective access for individual speakers," then it creates a nonpublic forum, *Ark. Educ. Television Comm'n*, 523 U.S. at 679-80; for example, the Combined Federal Campaign charity drive was deemed a nonpublic public forum because the Government had "limit[ed] participation in the [Campaign] to 'appropriate' voluntary agencies [*i.e.*, not including 'legal defense and political advocacy organizations,'] and ... require[d] agencies seeking admission to obtain permission from federal and local Campaign officials," *Cornelius*, 473 U.S. at 790, 804.

We must identify the relevant forum before we can classify it. Because Bryant seeks access only to the advertising section of each CEN, we treat the advertising

section – not the whole CEN, which the Government suggests – as the relevant forum. *Id*. at 801 ("In cases in which limited access is sought," we "take[] a more tailored approach to ascertaining the perimeters of a forum"); *see Lehman v. City of Shaker Heights*, 418 U.S. 298, 300-04 (1974) (plurality) (advertising spaces on city buses, where plaintiff wanted to run political ads, were relevant fora); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46-47 (1983) (where plaintiff wanted to distribute mail to school teachers, school's internal mail system was relevant forum).

Bryant contends the advertising section of a CEN is a public forum by designation or a "limited public forum," the regulation of which, he claims, must survive strict scrutiny. The Government says it is a nonpublic forum. Because the Government does not attempt to defend § 4.11 against strict scrutiny, and it is not obvious § 4.11 would survive such scrutiny, the question whether the advertising section of a CEN is a public or a nonpublic forum is potentially dispositive.

The "touchstone" for determining whether the Government has designated a forum public is its "intent in establishing and maintaining" that forum. *Stewart*, 863 F.2d at 1016. As the Supreme Court has made clear, "[t]he government does not create a designated public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse." *Ark. Educ. Television Comm'n*, 523 U.S. at 677 (quotation marks and brackets omitted). To ascertain the Government's intent, we look not only at the Government's "stated purpose" but also at "objective indicia of intent," such as "the nature of the property, its compatibility with expressive activity, and the *consistent* policy and practice of the government." *Stewart*, 863 F.2d at 1016-17; *see also Ark. Educ. Television Comm'n*, 523 U.S. at 677.

We conclude the advertising section of a CEN is a nonpublic forum.[*] This follows from the fundamental fact that CENs are intended solely to "facilitate accomplishment of the command or installation mission." DODI 5120.4 § 6.2.1.1.8. To that end, a CEN functions as a "conduit" for the flow of information between commanders and service members in order "to improve internal cooperation[,] mission performance[, and] morale," and to provide "assistance" to service members and their families. *Id*. § 6.2.1.1.1-3. Nothing in DODI 5120.4 suggests the advertising section has any purpose other than to further these mission-oriented aims. On the contrary, DODI 5120.4 provides the DoD may prevent the distribution of a CEN if it contains an advertisement that is "contrary to ... DoD or Military Service regulations, including [DODI 5120.4], or that may pose a danger or detriment to DoD personnel or their family members, or that interfere[s] with the command or installation missions," or "present[s] a danger to loyalty, discipline, or morale of personnel." *Id*. § E4.1.7.1-4; *see also United States v. Albertini*, 472 U.S. 675, 684-86 (1985) ("A military base ... is ordinarily not a public forum for First Amendment purposes even if it is open to the public"); *Shopco Distrib. Co., Inc. v. Commanding Gen.*, 885 F.2d 167, 172 & n.6 (4th Cir. 1989) (collecting decisions holding "military bases fall into the non-public forum category").

---

[*] The Government contends the decision in *Bryant v. Secretary of the Army* collaterally estops Bryant from denying that a CEN is a nonpublic forum. In response, Bryant says that decision addressed only whether the letters-to-the-editor feature of a CEN is a public forum, which is not at issue here. *See United States v. Stauffer Chem. Co*., 464 U.S. 165, 170-71 (1984) ("the doctrine of collateral estoppel can apply to preclude relitigation of both issues of law and issues of fact if those issues were conclusively determined in a prior action"). We do not decide whether Bryant is so precluded because we think it clear the relevant forum here is nonpublic.

Bryant argues that the DoD has in practice "opened" the advertising sections by running "political" ads. He likens this case to *Stewart*, in which we held the display of "large banners" and the distribution of "political literature" "clearly suggest[ed] that [RFK Stadium] ha[d] a practice – if not a policy – of allowing various types of first amendment activity to take place." 863 F.2d at 1019; *see also Lebron v. Wash. Metro. Area Transit Auth.*, 749 F.2d 893, 896 & n.6 (D.C. Cir. 1984) (WMATA "converted its subway stations into public fora by accepting ... political advertising").

The Government responds that Bryant has "failed to produce a single advertisement in any CEN that is political, partisan, or even vaguely comparable to his rejected material." Just so. Bryant offers up as "political" only the Dole and the FBI ads, neither of which has any political content or otherwise indicates the Government intended to open the forum for general expressive use. These two advertisements are, therefore, insufficient to show the DoD has anything approaching a "consistent policy and practice," *Stewart*, 863 F.2d at 1017 (emphasis omitted), of permitting expressive advertisements in general, political advertisements in particular, or any advertisements like Bryant's; indeed, its policy and practice have consistently been to exclude such advertisements. *See Lehman*, 418 U.S. at 300-01, 304 (plurality) (city did not designate advertising spaces on buses public fora when it permitted various types of advertisements but did not permit "*any* political or public issue advertising"); *Greer v. Spock*, 424 U.S. 828, 831, 838-39 & n.10 (1976) (Army did not "convert Fort Dix into a public forum [by hosting] a civilian lecture on drug abuse, a religious service by a visiting preacher ... or a rock musical concert" but no "[s]peeches and demonstrations of a partisan political nature"); *see also Shopco*, 885 F.2d at 172-73 (Marine Corps did not designate Camp Lejeune's residential area a public

forum by permitting delivery of pizza, laundry, and a civilian publication).

In sum, there is no evidence that, as the Government puts it, the DoD intended to establish or maintain the advertising section of a CEN "with the goal of fostering communication or assembly by the public." The advertising section is, therefore, a nonpublic forum. Consequently, the restriction upon speech in § 4.11 need only be reasonable in light of the purpose of the forum and viewpoint-neutral. It is clearly both.

The Government argues, and we agree, § 4.11 is reasonable on its face and as applied to Bryant's ads. The restrictions in § 4.11 upon the content of advertising are reasonably designed to ensure that advertising furthers (or at least does not hinder) the mission of a military command or installation, which is obviously a legitimate goal. *See Goldman v. Weinberger*, 475 U.S. 503, 507 (1986) ("The military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment; to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps"). The "political" content barred by § 4.11 – discussion of campaigns, candidates, parties, issues, and DoD policies – may disrupt the mission by undermining the camaraderie of service members, their clear understanding of and commitment to their mission, or even "the American constitutional tradition of a politically neutral military establishment under civilian control." *Greer*, 424 U.S. at 839. Bryant's advertisements posed just such a danger. The exclusion in § 4.11 of political advertising, and of Bryant's advertisements in particular, is therefore reasonable. *See id.* at 831 & n.2, 839-40 (upholding regulations barring "[d]emonstrations, ... political speeches and similar activities" on military base and authorizing commander to exclude

14

"publication [that] presents a clear danger to the loyalty, discipline, or morale of troops at [the] installation"); *cf. Lehman*, 418 U.S. at 299-300, 304 (plurality) (transit system's ban on "political advertising" held reasonable because political advertisements could subject riders to "blare of political propaganda" and create "lurking doubts about favoritism").

Bryant asserts § 4.11, "as written and applied to [his advertisements], discriminate[s] against [his] viewpoint." Insofar as Bryant makes a claim of facial viewpoint discrimination, his claim is patently unfounded because, as the Government points out, § 4.11 by its terms does "not distinguish between political viewpoints." Insofar as Bryant makes a claim of as-applied viewpoint discrimination, his claim is doubly forfeit: He never raised the claim in the district court, and in his opening brief on appeal he offered only the single, conclusory statement just quoted. *SEC v. Loving Spirit Found., Inc.*, 392 F.3d 486, 491 (D.C. Cir. 2004); *N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work") (quotation marks omitted).

## III. Conclusion

In sum, § 4.11 of DODI 5120.4 does not violate Bryant's First Amendment rights. The regulation is clear, not vague. It is also reasonable in light of the purpose of the advertising section of a CEN and viewpoint-neutral, which, because the advertising section is a nonpublic forum, is all the First Amendment requires. The judgment of the district court is therefore

*Affirmed*.

KAVANAUGH, *Circuit Judge*, concurring: In defending this suit, the Government has accepted that the military newspapers' advertising space is a "non-public forum" for First Amendment purposes, meaning that the military may not engage in viewpoint discrimination in accepting advertisements. The Government contends that the military has not engaged in impermissible viewpoint discrimination, and the Court agrees. In light of the way the Government argued the case, I join the Court's fine opinion. Lest this precedent be misinterpreted, however, I write separately to point out that, as Judge Kollar-Kotelly suggested in footnote 5 of her thorough district court opinion, there is a far easier way to analyze this kind of case under the Supreme Court's precedents. *See Bryant v. Rumsfeld*, No. 04-cv-1125, slip op. at 12 n.5 (D.D.C. Mar. 12, 2007).

These military-run newspapers and the advertising space in them are not forums for First Amendment purposes but instead are the Government's own speech. *See Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 672-75 (1998); *see also Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553, 559-60 (2005); *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 203-05 (2003) (plurality opinion); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001); *Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 234-35 (2000); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587-88 (1998); *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995); *Rust v. Sullivan*, 500 U.S. 173, 196 (1991). As the case law makes clear, "government speech" can include not only the words of government officials but also "compilation of the speech of third parties" by government entities such as libraries, broadcasters, newspapers, museums, schools, and the like. *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) (internal quotation marks

omitted). For example, "[w]hen a public broadcaster exercises editorial discretion in the selection and presentation of its programming, it engages in speech activity." *Arkansas Educ. Television Comm'n*, 523 U.S. at 674.

When government speech is involved, forum analysis does not apply and the Government may favor or espouse a particular viewpoint. As we have said: "The government may produce films and publications. It may run museums, libraries, television and radio stations, primary and secondary schools, and universities. In all such activities, the government engages in the type of viewpoint discrimination that would be unconstitutional if it were acting as a regulator of private speech." *Gittens*, 414 F.3d at 29. The Supreme Court made the same point in the context of public broadcasters: "Much like a university selecting a commencement speaker, a public institution selecting speakers for a lecture series, or a public school prescribing its curriculum, a broadcaster by its nature will facilitate the expression of some viewpoints instead of others. Were the judiciary to require, and so to define and approve, pre-established criteria for access, it would risk implicating the courts in judgments that should be left to the exercise of journalistic discretion." *Arkansas Educ. Television Comm'n*, 523 U.S. at 674. The rule established by these cases is that the Government "has largely unlimited power to control what is said in its official organs (newspapers, radio broadcasts, and the like) or in organs that it officially endorses, even if this control is exercised in a viewpoint-based way." EUGENE VOLOKH, THE FIRST AMENDMENT AND RELATED STATUTES: PROBLEMS, CASES AND POLICY ARGUMENTS 410 (3d ed. 2008).

Those principles readily resolve this case. The military newspapers constitute government speech, and the military

therefore may exercise viewpoint-based editorial control in running them. The military may, for example, permit advertisements that say "Support the Troops" but decline advertisements that say "Oppose the Troops." If forum analysis applied, however, the military could not maintain that kind of sensible editorial policy.

The conclusion that forum analysis does not apply here has special force because this case involves *military* newspapers. The United States Military maintains these newspapers "to facilitate accomplishment of the command or installation mission." Department of Defense Instruction 5120.4, ¶ 6.2.1.1.8 (June 16, 1997). As the Supreme Court has stated, the military is "not a deliberative body. It is the executive arm. Its law is that of obedience. . . . Speech that is protected in the civil population may nonetheless undermine the effectiveness of response to command." *Parker v. Levy*, 417 U.S. 733, 744, 759 (1974) (internal quotation marks omitted). Therefore, "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society. The military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment; to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps." *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986). In light of these precedents, the plaintiff's suggestion that the Judiciary micro-manage advertising selection by military newspapers not only is unsupported by First Amendment doctrine, but also would interfere with the military's pursuit of its critical mission and involve the courts in military decisions and assessments of morale, discipline, and unit cohesion that the Supreme Court has indicated are well beyond the competence of judges.

With that understanding, I join the Court's opinion, which correctly resolves the case as it was argued to us.